**M-10-309**

**M-1**

JEG:AHT
F.#2010RO0571

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X          <u>UNDER SEAL</u>

UNITED STATES OF AMERICA

    -against-

VADIM NEKRITIN,
ZHANNA GLIKMAN and
IGOR LOSHAKOV,

       Defendants.

- - - - - - - - - - - - - - - - -X
- - - - - - - - - - - - - - - - -X

IN THE MATTER OF THE SEARCH OF THE
PREMISES KNOWN AND DESCRIBED AS
(1) 2306 AVENUE U, BROOKLYN, NEW YORK,
(2) 2705 MERMAID AVENUE, BROOKLYN, NEW
YORK, AND (3) 1316B GRAVESEND NECK
ROAD, FIRST FLOOR, BROOKLYN, NEW YORK

- - - - - - - - - - - - - - - - -X

COMPLAINT AND AFFIDAVIT
IN SUPPORT OF APPLICATION
FOR ARREST WARRANT
(T. 18, U.S.C., § 1347)

AFFIDAVIT IN SUPPORT
OF SEARCH WARRANT
(T. 18, U.S.C., § 1347)

EASTERN DISTRICT OF NEW YORK, SS:

       JOSEPH GIAMBALVO, being duly sworn, deposes and says:

Upon information and belief, in or about and between 2005 and

2009, within the Eastern District of New York and elsewhere, the

defendants VADIM NEKRITIN, ZHANNA GLIKMAN, and IGOR LOSHAKOV,

together with others, did knowingly and willfully conspire to

execute a scheme and artifice to defraud a health care benefit

program affecting commerce, as defined in Title 18, United States

Code, Section 24(b), to wit: Medicare, and to obtain, by means of

materially false and fraudulent pretenses, representations and

promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items and services.

(Title 18, United States Code, Section 1347)

Also upon information and belief, there is probable cause to believe that within the premises known and described as 2306 Avenue U, Brooklyn, New York (the "Avenue U Location"), 2705 Mermaid Avenue, Brooklyn, New York (the "Mermaid Avenue Location"), and 1316B Gravesend Neck Road, First Floor, Brooklyn, New York (the "Gravesend Neck Road Location") (collectively, the "SUBJECT PREMISES") there are records, files, correspondence, memoranda, computer, computer drive/disks, bank and other financial records, data, and other materials, all of which constitute evidence, fruits and instrumentalities of violations and attempted violations of, and conspiracies to violate, <u>inter alia</u>, Title 18, United States Code, Section 1347 (Health Care Fraud); and Title 18, United States Code, Section 1349 (Health Care Fraud Conspiracy).

The source of your deponent's information and the grounds for his belief are as follows:[1]

---

[1] Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all of the relevant facts and circumstances of which I am aware.

1.    I am a Special Agent with the Health and Human Services, Office of the Inspector General ("OIG") and am currently assigned to investigate health care fraud violations, including schemes to defraud the Medicare and Medicaid programs. Among other duties, I am now participating in an investigation relating to allegations of violations and attempted violations of, and conspiracies to violate, Title 18, United States Code, Section 1347 (Health Care Fraud); and Title 18, United States Code, Section 1349 (Health Care Fraud Conspiracy), inter alia, by VADIM NEKRITIN, ZHANNA GLIKMAN, IGOR LOSHAKOV and others known and unknown.

2.    I have been an OIG Special Agent for approximately fifteen years.  During my tenure with the OIG, I have participated in a variety of criminal health care fraud investigations, during the course of which I have interviewed witnesses, conducted physical surveillance, executed search warrants, reviewed Medicare claims data, bank records, phone records, Medicare beneficiaries' medical records, invoices, and other business records.  I am familiar with the records and documents maintained by health care providers and the laws and regulations related to the administration of the Medicare program.

3.    I have personally participated in the investigation of the offense referred to above, and am familiar

3

with the relevant facts and circumstances.  The information contained in this Affidavit is based on my own observations and on discussions I have had with other law enforcement personnel. Because this Affidavit is being submitted for the limited purpose of obtaining search and arrest warrants, I have not set forth each and every fact learned during the course of this investigation, but simply those facts that I believe are necessary to establish probable cause to support the issuance of a search warrant of the SUBJECT PREMISES.  Except where otherwise noted, all conversations described in this Affidavit are set forth in part and in substance only.

### THE SUBJECT PREMISES[2]

4.    The "Avenue U Location" is a one-story, brick building, at 2306 Avenue U, Brooklyn, New York, between East 23rd Street and East 24th Street.  The location is a medical practice for approximately six doctors.  There is a main entrance on Avenue U.  At the main entrance, there is a red awning, with "New York-Beverly Hills" in white lettering on it.  Inside the main entrance is a reception area immediately to the left and patient rooms to the right and left of a corridor that extends to the back of the building.

---

[2]    In the event that any of the SUBJECT PREMISES are partitioned into separate offices or file centers indicating that neither NEKRITIN, GLIKMAN nor LOSHAKOV maintain files in that area, agents will not search the area.

4

5.    The "Mermaid Avenue Location" is a one-story building at 2705 Mermaid Avenue, Brooklyn, New York, between West 27th Street and West 28th Street.  The location is a medical practice.  It is unknown how many doctors practice at the location because there is no directory or listing posted in public view.  The Mermaid Avenue Location has a blue awning labeled "Medical Center, 2705, (718)865-2222."  The entrance is a glass door that leads directly into a general lobby area.  There are two gates that cover the windows on either side of the entrance.  Inside the main entrance is a reception area to the right.  All of the doctors' offices and patient treatment areas are accessible through one of two doors which are directly in front of the entrance of the location.

6.    The "Gravesend Neck Road Location" is located on the first floor of a multi-floor building at 1316B Gravesend Neck Road, Brooklyn, New York between East 13th Street and East 14th Street.  The location is a medical practice for approximately six doctors.  There is a blue sign above the first floor that reads "Healthcare Inc., Medical Office, 934-5174."  The entrance is a white door below a blue awning that has "1316B" written in white letters on it.  There is a glass window to the left of the entrance that lists the medical practices in the facility.

5

## BACKGROUND

7.    The Medicare program ("Medicare") is a federal
health care program providing benefits to persons who were over
the age of 65 or disabled.  Medicare is administered by the
Centers for Medicare and Medicaid Services ("CMS"), a federal
agency under the United States Department of Health and Human
Services.  Individuals who receive benefits under Medicare are
referred to as Medicare "beneficiaries."

8.    Medicare is a "health care benefit program," as
defined by Title 18, United States Code, Section 24(b).

9.    Medicare includes coverage under two primary
components, hospital insurance ("Part A") and medical insurance
("Part B").  Medicare Part B covers the costs of physicians'
services and outpatient care, including chemical cauterizations.

10.   Medical providers certified to participate in
Medicare, whether clinics or individuals, are assigned a provider
identification number ("PIN") for billing purposes.  After a
medical provider renders a service, the provider used its PIN
when submitting a claim for reimbursement to the Medicare
contractor or carrier assigned to that provider's state.

11.   Medical providers are provided with online access
to Medicare manuals and service bulletins describing proper
billing procedures and billing rules and regulations.  Medical
providers are permitted to submit reimbursement claims only for

6

services they actually rendered, and providers are required to maintain patient records verifying the provision of services.

12.   To receive reimbursement for a covered service from Medicare, a medical provider is required to submit a claim, either electronically or in writing through Form CMS-1500 or UB-92.  The claim had to include information identifying the medical provider, the patient and the services rendered.

### CHEMICAL CAUTERIZATIONS

13.   Chemical cauterizations entail destroying a form of exuberant or excessive healing tissue known as granulation tissue.  A chemical cauterization of granulation tissue is done to destroy hyper-granulation tissue, which occurs when there is something embedded in a chronically open wound.  The purpose for the procedure is to destroy the proud flesh and prevent the skin from hardening.  A caustic chemical such as silver nitrate or phenol is applied directly to the granulation tissue causing a chemical burn of the tissue.  This procedure requires a local anaesthetic unless it is done on a patient without sensation in the area that is being treated.  This procedure is normally done on a one-time basis to a particular area and is not medically appropriate to be done every two months because the chemicals are very caustic and repeated application can cause cancerous tissue to form.  A chemical cauterization of granulation tissue is

7

considered a surgical procedure and thus must be performed by a
licensed Doctor of Podiatric Medicine.

14.  Medicare reimburses doctors for chemical
cauterizations.  When billing for a chemical cauterization of
granulation tissue, providers use Current Procedural Terminology
("CPT") code 17250.

### THE DEFENDANTS AND THEIR OFFICES

15.  VADIM NEKRITIN is a licensed Doctor of Podiatric
Medicine certified to participate in Medicare.

16.  ZHANNA GLIKMAN is a licensed Doctor of Podiatric
Medicine certified to participate in Medicare.

17.  IGOR LOSHAKOV is a licensed Doctor of Podiatric
Medicine certified to participate in Medicare.

18.  In order to bill Medicare for claims, NEKRITIN,
GLIKMAN and LOSHAKOV each submitted a Medicare Enrollment
Application ("application") to Medicare.  The application
required a provider to provide Medicare with information such as
the offices at which the doctor will provide services, bank
accounts into which Medicare would deposit money, copies of
invoices from medical suppliers, insurance forms, and IRS forms.

19.  In his application, NEKRITIN indicated that his
offices were located at the Avenue U Location and the Mermaid
Avenue Location.

8

20.  In her application, GLIKMAN indicated that her office was located at the Avenue U Location.

21.  In his application, LOSHAKOV indicated that his office was located at the Avenue U Location.

22.  Based upon billing records,  NEKRITIN, GLIKMAN and LOSHAKOV operate offices at the Avenue U Location, and, in many cases, treated the same patients at that location.

23.  Based upon billing records, Dr. NEKRITIN also operates an office at the Mermaid Avenue Location.

24.  Based upon billing records, Dr. LOSHAKOV also operates an office at the Gravesend Neck Road Location. Additionally, investigators have interviewed Medicare Beneficiaries identified from Dr. LOSHAKOV's billing information who have identified the Gravesend Neck Location as the office at which they were treated.

### FACTS ESTABLISHING PROBABLE CAUSE

25.  On or about and between 2005 and the present, NEKRITIN, GLIKMAN and LOSHAKOV have billed Medicare and Medicare for chemical cauterization of granulation tissue using CPT code 17250 for numerous patients.

26.  Based upon billing records, investigators identified and interviewed numerous Medicare Beneficiaries who were patients of NEKRITIN, GLIKMAN and LOSHAKOV (the "Medicare Beneficiaries") and allegedly received chemical cauterizations on

9

or about and between January 5, 2005 and the present.  The following are several examples of the results of those interviews:

a.    Beneficiary A has indicated that she was treated at the Avenue U Location on or about and between February 10, 2009 and June 15, 2009.  Beneficiary A stated that she treated by Dr. NEKRITIN and his employees.  During these treatments, Beneficiary A's feet were cleaned, her toenails were cut and cleaned, the skin around her toenails was removed, and a lotion was applied to her feet.  Beneficiary A stated that she experienced no pain, numbness and/or difficulty walking, as would be expected from a patient that had just undergone a chemical cauterization.  However, according to Dr. NEKIRTIN's billing records, he treated Beneficiary A with chemical cauterizations during the above-stated dates.

b.    Beneficiary B has indicated that he was treated at the Avenue U Location on or about and between March 31, 2008 and August 20, 2009.  Beneficiary B stated that he was treated by Dr. GLIKMAN or her employees.  During these treatments, Beneficiary B's feet were cleaned, his toenails were cut and cleaned, the skin around his toenails was removed, and a lotion was applied to his feet.  Beneficiary B stated that he experienced no pain, numbness and/or difficulty walking, as would be expected from a patient that had just undergone a chemical

10

cauterization.  However, according to Dr. GLIKMAN's billing
records, she treated Beneficiary B with chemical cauterizations
during the above-stated dates.

          c.  Beneficiary C has indicated that she was
treated at the Avenue U Location on or about December 6, 2006.
Based upon billing records, Dr. LOSHAKOV billed Medicare for
Beneficiary C's treatment on November 21, 2007.  However,
Beneficiary C does not recall being treated by Dr. LOSHAKOV
himself.  Rather, Beneficiary C was treated by a nurse.  During
this treatment, Beneficiary C's feet were cleaned, her toenails
were cut and cleaned, the skin around her toenails was removed,
and a lotion was applied to her feet.  Beneficiary C stated that
she experienced no pain, numbness and/or difficulty walking, as
would be expected from a patient that had just undergone a
chemical cauterization.  However, according to Dr. LOSHAKOV's
billing records, he treated Beneficiary C with chemical
cauterizations during the above-stated dates.

          d.  Beneficiary D has indicated that she was
treated at the Mermaid Avenue Location on or about and between
December 26, 2007 and September 23, 2009.  Beneficiary D stated
that she was treated by Dr. NEKRITIN or his employees.  During
these treatments, Beneficiary D's feet were cleaned, her toenails
were cut and cleaned, the skin around her toenails was removed,
and a lotion was applied to her feet.  Beneficiary D stated that

she experienced no pain, numbness and/or difficulty walking, as would be expected from a patient that had just undergone a chemical cauterization. However, according to Dr. NEKIRTIN's billing records, he treated Beneficiary D with chemical cauterizations during the above-stated dates.

e. Beneficiary E has indicated that she was treated at the Gravesend Neck Location on or about and between February 2, 2005 and February 4, 2009. Beneficiary E stated that she was treated by Dr. LOSHAKOV or his employees. During these treatments, Beneficiary E's feet were cleaned, her toenails were cut and cleaned, the skin around her toenails was removed, and a lotion was applied to her feet. Beneficiary E stated that she experienced no pain, numbness and/or difficulty walking, as would be expected from a patient that had just undergone a chemical cauterization. However, according to Dr. LOSHAKOV's billing records, he treated Beneficiary E with chemical cauterizations during the above-stated dates.

27. Based on these interviews and numerous others conducted with Medicare Beneficiaries treated by NEKRITIN, GLIKMAN and LOSHAKOV, investigators have determined that the Medicare Beneficiaries did not receive many of the chemical cauterization treatments for which Medicare was billed.

28. Based on NEKRITIN, GLIKMAN and LOSHAKOV's billing history, Medicare Beneficiaries received numerous chemical

12

cauterizations of granulation tissue, and, in many cases, billed Medicare for chemical cauterizations of granulation tissue at two-month intervals for each of the Medicare Beneficiaries. For example, investigators have discovered that, according to NEKRITIN and GLIKMAN's billing records, Beneficiary F received 11 chemical cauterizations from on or about and between October 12, 2007 and October 14, 2009. Moreover, according to these same records, Beneficiary F received chemical cauterizations of granulation tissue on or about May 2, 2008, July 3, 2008, September 5, 2008, November 7, 2008, January 9, 2009 and March 13, 2009. Because of the damage done to the patient's skin and the potential side effects, it is not possible that an individual could have this many treatments over the stated time period.

29. Based on the foregoing information, NEKRITIN, GLIKMAN and LOSHAKOV are not providing chemical cauterization treatments to their beneficiaries as billed. NEKRITIN, GLIKMAN and LOSHAKOV are providing a cleaning and basic maintenance to many of the Medicare Beneficiaries' feet. However, they are billing Medicare for chemical cauterization of granulation tissue, which is a surgical procedure.

## THE APPLICATION FOR SEARCH WARRANTS

### BUSINESS RECORDS

30.   Businesses routinely document and maintain records of their operating accounts - both in hard copy and electronically - including the receipt, expenditure and accounting of business funds.  Businesses also maintain detailed records of their business activities, including with respect to vendors, customers, lenders and employees.  As such, there is probable cause to believe that there will be located at the SUBJECT PREMISES business records documenting treatments that were provided by NEKRITIN, GLIKMAN, LOSHAKOV and others involved in the fraudulent scheme.

31.   Based on my knowledge, training, and experience, businesses billing Medicare are required to maintain records of patient files, bills, invoices, and claims for payment/reimbursements for services billed, provided, or alleged to have been provided for a period of six years.  Those records include, among other things, reimbursement claim forms, explanations of medical benefits, detailed written orders or prescriptions, certificates of medical necessity, information from the treating physician concerning the patients' diagnosis, proof of delivery of services and/or items that were submitted by any representative acting on behalf of NEKRITIN, GLIKMAN, and LOSHAKOV for reimbursement by Medicare.

14

32. Based on my knowledge, training, and experience, businesses billing Medicare also retain contracts, agreements, papers, and affiliated records pertaining to providing of medical services, including chemical cauterizations.

33. Based on my knowledge, training, and experience, businesses billing Medicare also retain letters relating to efforts to collect co-payments and deductibles from individuals that receive health care coverage from Medicare. In addition, businesses retain correspondence and cancelled checks relating to such things as notices of overpayment and request for refunds from Medicare and Medicaid. Businesses billing Medicare also have correspondence to and from Medicare and Medicaid including, but not limited to, manuals, advisories, newsletters, bulletins, and publications. Businesses also retain correspondence to and from patients regarding Medicare and Medicaid.

34. Based on my knowledge, training, and experience, the financial books and records and documents constituting bank accounts, money market accounts, checking accounts, investment accounts, stock fund accounts, 401K funds, mutual funds, retirement funds, bonds, or bund funds, including deposits and disbursements, cancelled checks or draft electronic transfers, ledgers, credit card, ATM, and debit card accounts are also retained by businesses.

35. Based on my knowledge, training, and experience,

15

contracts, agreements, logs, lists or papers affiliated with any medical professional services, referrals, or storage including records of payment are also retained by businesses.

36. Based on my knowledge, training, and experience, medical providers often hire outside medical insurance billing companies. Therefore, all contracts, agreements, or paper affiliated with these companies is relevant.

37. In light of the fact that the SUBJECT PREMISES are currently operating as medical offices, there is probable cause to believe that business records related to Medicare fraud as described herein are being maintained at the SUBJECT PREMISES.

### SPECIFICS REGARDING THE SEIZURE AND SEARCHING OF COMPUTER SYSTEMS FOUND ON THE SUBJECT PREMISES

38. Based on my training and experience, businesses often electronically store documents that are relevant to the fraudulent scheme, such as patient files, including, but not limited to, the patients listed in Attachment C, business plans, correspondence, spreadsheets of expenses and revenue, and invoices. There is probable cause to believe that the computers at the SUBJECT PREMISES contain electronic versions of the above-mentioned documents.

39. Based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including

16

hard disk drives, floppy disks, compact disks, magnetic tapes, memory chips and other portable and removable media.  I also know that during the search of the premises it is not feasible to search computer equipment and storage devices for data for a number of reasons, including the following:

a.    Searching computer systems is a highly technical process which requires specific expertise and specialized equipment.  There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

b.    Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data.  Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the

17

equipment and storage devices from which the data will be
extracted.

        c.    The volume of data stored on many computer
systems and storage devices will typically be so large that it
will be highly impractical to search for data during the
execution of the physical search of a premises. A single
megabyte of storage space is the equivalent of 500 double-spaced
pages of text. A single gigabyte of storage space, or 1,000
megabytes, is the equivalent of 500,000 double-spaced pages of
text. Storage devices capable of storing 160 gigabytes ("GB") of
data are now commonplace in desktop computers. Consequently,
each non-networked, desktop computer found during a search can
easily contain the equivalent of 80 million pages of data, which,
if printed out, would result in a stack of paper over four miles
high.

        d.    Computer users can attempt to conceal data
within computer equipment and storage devices through a number of
methods, including the use of innocuous or misleading filenames
and extensions. For example, files with the extension ".jpg"
often are image files; however, a user can easily change the
extension to ".txt" to conceal the image and make it appear that
the file contains text. Computer users can also attempt to
conceal data by using encryption, which means that a password or
device is necessary to decrypt the data into readable form. In

18

addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

       e.   Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little to no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensic tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space - for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a

"swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

40.  In light of these concerns, I hereby request the Court's permission to search, copy, image and seize the computer hardware (and associated peripherals) that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the image or hardware for the evidence fruits and instrumentalities of violations of the Specified Federal Offenses.

41.  Based on all of the foregoing facts, there is probable cause to believe that a search of the SUBJECT PREMISES will lead to the discovery of the items outlined above (described more fully in Attachment B, incorporated by reference herein) which items constitute evidence, fruits, and/or instrumentalities of violations of Title 18, United States Code, Sections 1347 and 1349.

20

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued for defendants VADIM NEKRITIN, ZHANNA GLIKMAN, and IGOR LOSHAKOV, so that they may be dealt with according to law.

WHEREFORE, your deponent respectfully requests that a warrant be issued pursuant to Rule 41 of the Federal Rules of Criminal Procedure, to search the SUBJECT PREMISES, more particularly described in Attachment A, authorizing the seizure of the items described in Attachment B, which constitute evidence, contraband, fruits, and other items related to violations of Title 18, United States Code, Section 1347 (Health Care Fraud); and Title 18, United States Code, Section 1349 (Health Care Fraud Conspiracy).

WHEREFORE, it is further respectfully requested that this Court issue an Order sealing, until further order of this Court, all papers submitted in support of this Application, including the Application, Affidavit, and Search Warrant, and the requisite inventory notice (with the exception of one copy of the warrant and the inventory notice that will be left at the SUBJECT PREMISES). Sealing is necessary because the items and information to be seized are relevant to an ongoing investigation, and premature disclosure of the contents of this

21

Affidavit and related documents may have a negative impact on
this continuing investigation and may jeopardize its
effectiveness.

_____

JOSEPH GIAMBALVO
Special Agent
Health and Human Services Inspector
General

Sworn to before me this
23 day of March, 2010

HO]
UN:        S/ Reyes        TE JUDGE
EA!                        N YORK

_____

22

## ATTACHMENT A

## DESCRIPTION OF PREMISES TO BE SEARCHED

### (2306 Avenue U, Brooklyn, New York)

The "Avenue U Location" is a one-story, brick building, at 2306 Avenue U, Brooklyn, New York, between East 23rd Street and East 24th Street. The location is a medical practice for approximately six doctors. There is a main entrance on Avenue U. At the main entrance, there is a red awning, with "New York-Beverly Hills" in white lettering on it. Inside the main entrance is a reception area immediately to the left and patient rooms to the right and left of a corridor that extends to the back of the building.

### (2705 Mermaid Avenue, Brooklyn, New York)

The "Mermaid Avenue Location" is a one-story building at 2705 Mermaid Avenue, Brooklyn, New York, between West 27th Street and West 28th Street. The location is a medical practice. It is unknown how many doctors practice at the location because there is no directory or listing posted in public view. The Mermaid Avenue Location has a blue awning labeled "Medical Center, 2705, (718)865-2222." The entrance is a glass door that leads directly into a general lobby area. There are two gates that cover the windows on either side of the entrance. Inside the main entrance is a reception area to the right. All of the doctors' offices and patient treatment areas are accessible

23

through one of two doors which are directly in front of the entrance of the location.

### (1316B Gravesend Neck Road, Brooklyn, New York)

The "Gravesend Neck Road Location" is located on the first floor of a multi-floor building at 1316B Gravesend Neck Road, Brooklyn, New York between East 13th Street and East 14th Street. The location is a medical practice for approximately six doctors. There is a blue sign above the first floor that reads "Healthcare Inc., Medical Office, 934-5174." The entrance is a white door below a blue awning that has "1316B" written in white letters on it. There is a glass window to the left of the entrance that lists the medical practices in the facility.

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

Unless otherwise specified, any and all of the following named records, documents, items and information concerning the following, in any format in which the information may exist:

1.    Documents constituting, concerning, or relating to patient files, bills, invoices, and claims for payment/reimbursement for services billed, provided, or alleged to have been provided to patients to include but not limited to reimbursement claim forms (HCFA/CMS 1500), explanations of medical benefits, dispensing orders, written orders or prescriptions, certificates of medical necessity, information from the treating physician concerning the patients' diagnosis, and proof of delivery of services for or reimbursements by, Medicare and Medicaid by NEKRITIN, GLIKMAN and/or LOSHAKOV or anyone acting on their behalf.

2.    All contracts, agreements, papers, and affiliated records constituting, concerning, or relating to providing of chemical cauterizations by NEKRITIN, GLIKMAN and/or LOSHAKOV, or any representative acting on their behalf, to include, but not limited to, manufacturer catalogs, purchase orders, invoices, and receipts.

3.    All letters to or from NEKRITIN, GLIKMAN and/or

25

LOSHAKOV constituting, concerning, or relating to efforts to collect payments, co-payments and/or deductibles for individuals that receive health care coverage from Medicare.

4.    All correspondence and cancelled checks to or from NEKRITIN, GLIKMAN and/or LOSHAKOV relating to notice of overpayment and request for refunds from Medicare and Medicaid.

5.    All correspondence between NEKRITIN, GLIKMAN and/or LOSHAKOV and Medicare and/or Medicaid including, but not limited to manuals, advisories, newsletters, bulletins, and publications.

6.    All correspondence to and from patients of NEKRITIN, GLIKMAN and/or LOSHAKOV regarding Medicare and Medicaid.

7.    All correspondence between NEKRITIN, GLIKMAN and/or LOSHAKOV.

8.    Financial books and records and documents belonging to NEKRITIN, GLIKMAN and/or LOSHAKOV constituting, concerning, or relating to the following:

(a)    Bank Accounts, money market accounts, checking accounts, investment accounts, stock fund accounts, 401K funds, mutual funds, retirement funds, bonds or bond fund; Including deposits and disbursements, cancelled checks or draft electronic transfers, ledgers, loan statements, loan agreements; and

26

(b)   Credit card/ATM/debit card accounts.

9.   All contracts, agreements, logs, lists or papers affiliated with any medical professional services, referrals, or storage for NEKRITIN, GLIKMAN and LOSHAKOV to include, but not limited to records of payment by NEKRITIN, GLIKMAN and LOSHAKOV.

10.   All employee files and resumes relating to work done for NEKRITIN, GLIKMAN and/or LOSHAKOV.   This may include, but is not limited to, any handwritten or computer files listing any and all employee names addresses, telephone numbers, and background information for all current and former employees;

11.   All contracts, agreements or documents affiliated with any outside medical insurance billing company for Dr. NEKRITIN, GLIKMAN and/or LOSHAKOV.

12.   Additionally, all computer equipment and the items, listed above, which are contained in any computer equipment as follows, and pertain to the above listed persons, business, or entities:

(a)   Computer equipment, including any electronic devices which are capable of collecting, analyzing, creating, displaying, converting, storing, concealing, or transmitting electronic, magnetic, optical, or similar computer impulses or data.   These devices include but are not limited to any data-processing hardware (such as central processing units, memory typewriters, and self-contained "laptop" or "notebook"

27

computers); internal and peripheral storage devices (such as laser disks, fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to such hardware (such as physical keys and locks);

(b)   Information, instructions, programs or program code, stored in the form of electronic, magnetic, optical, or other media which are capable of being interpreted by a computer of its related components, data, data fragments or control characters integral to the operation of computer software, operating system software, applications software, utility programs, compilers, interpreters, communications software, and other programming used or intended for use to communicate with computer components;

(c)   Any written, recorded, printed or electronically stored material which explains or illustrates the

28

configuration or use of any seized hardware, software, or related
item;

(d)   Devices, programs, or data-whether themselves
in the nature of hardware of software-that can be used or is
designed for use to restrict access to or facilitate concealment
of any computer hardware, computer software, computer-related
documentation, electronic data, records documents or materials
within the scope of this application, any data security
hardware(such as any encryption devices, chips and circuit
boards),passwords, data security software of information (such as
test keys and encryption codes), and similar information that is
required to access computer or data or to otherwise render
programs or data into a useable form;

(e)   Any information stored in the form of
electronic, magnetic, optical, or other coding on computer media
or on media capable of being read by a computer or
computer-related equipment.  This media includes but is not
limited to any fixed disks, external hard disks, removable hard
disk cartridges, floppy disk drives and diskettes, tape drives
and tapes, optical storage devices, laser disks, or other memory
storage devices;

(f)   Any handmade form (such as writing, drawing,
painting, with any implement on any surface, directly or
indirectly); any photographic form (such as microfilm,

29

microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); any mechanical form (such as phonograph records, printing, or typing); any electrical, electronic, or magnetic form (such as tape recordings, cassettes, compact discs), or any information on an electronic or magnetic storage device (such as floppy diskettes, hard disks, CD-ROMs, optical discs, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks), as well as printouts or readouts from any magnetic storage device.

(g)   Any and all communications previously received or transmitted, or prepared in contemplation of transmission, including electronic mail or data associated with electronic bulletin board systems, stored on any of the electronic media named above.  All electronic communications, including those previously received or transmitted, or held in temporary, intermediate storage incident to transmission, documents, and materials, including those used to facilitate communications, as used above shall include any and all communications previously received, transmitted, or stored, or prepared in contemplation of transmission, including electronic mail or data associated with electronic bulletin board systems, whether stored on any of the electronic media named above or held in temporary, intermediate storage incident to transmission to the individuals or premises within the scope of this application.

30

(h)   Any and all electronic information or electronic data, stored in any form, which is used or has been prepared for use either for periodic or random back-up (whether deliberate or inadvertent, or automatically or manually initiated), or any computer or computer system, floppy diskettes, fixed hard disks, removable hard disk cartridges, tapes, laser disks, videocassettes, and other media capable or storing magnetic or optical coding.

(i)   Such electronic data in the form of electronic records, documents, and materials, including those used to facilitate communication;

(j)   "Hidden", erased, compressed, password-protected, or encrypted files;

(k)   "Mainframe" computers, or of "micro" or "personal"computers, either standing alone or joined through a series of connected computers called a "network";

(l)   All magnetic storage devices as well as the central processing units (CPUs) and applicable keyboards and monitors which are an integral part of the processing unit; and

(m)   Various file "directories" and the individual files they contain, recently deleted data; scanning storage areas for deliberately hidden files; all of which constitute evidence,

31

fruits and instrumentalities of violations and attempted violations of, and conspiracies to violate, inter alia, Title 18, United States Code, Section 1347 (Health Care Fraud).

## ATTACHMENT C

## PATIENT FILES TO BE SEIZED

The following is a list of the patients whose files are to be seized:

Yelizar Bakhnov, Antonina Bazhenova, Fima Berkovich, Svetlana Bobrova, Dora Borthovsky, Naum Braslavskiy, Joann Bratton, Marianna Brodskaya, Brukhaleya Brufman, Izobella Burd, Mayya Chernyavskaya, Zhanna Dashevskaya, Larisa Demyanovich, Vladimir Dikarev, Roza Dikareva, Grigoriy Direktor, Sheva Direktor, Gita Dribinskaya, Aleksandr Fayn, Raya Fayn, Adelina Filiyeva, Sulamif Froom, Ida Gadyak, Stepan Gadyak, Mark Gas, Svetlana Gekker, Feyga Gersher, Freyda Gershkovich, Joseph Gerzberg, Feliks Ginzburg, Izabella Ginzburg, Sofya Goldenberg, Grigoriy Goroshnik, Isaak Khodorov, Maya Khokhlovkina, Yuliy Khotimskiy, Tatyana Krasner, Bella Kulik, Mayya Ladina, Nina Libman, Sofya Lobova, Fanya Mashkevich, Nadezhda Melnik, Rakhil Melnikova, Rimma Melnikova, Yefim Milshteyn, Valeriy Mizyuk, Anatoliy Mogilner, Khaya Moloksher, Yelizaveta Myaskovskaya, Aleksandr Myaskovskiy, Mariya Nemenman, Lyudmila Olshanetskaya, Valentina Papouk, Mikhail Perelshteyn, Anna Savonina, Igor Shapiro, Inna Shapiro, Alla Shaulova, Yefim Shevts, Mara Shkolnik, Yakov Shkolnik, Alisa Shmeyselman, Lev Shnaydman, Miriam Shubova, Yakov Shvarts, Raisa Tarakanova, Khanna Tseytina, Lyudmila Ulanovskaya, Anatoliy Veshninskiy, Pesya Vilnits, Polina

33

Volk, Era Alter, Yakov Arlyuk, Feyga Aronina, Semyon Aronov, Yevgeniy Astanovskiy, Igor Ayzenberg, Mark Ayzenshtat, Motel Bak, Lyudmila Bakhrakh, Arkady Barsky, Grigoriy Belyavin, Yelena Berenshteyn, Khaya Bernshteyn, Maya Bernshteyn, Raisa Binder, David Birg, Isaak Blinchevskiy, Israil Bondarev, Mikhail Bondarev, Moisey Chachko, Meri Chernyavskaya, Raya Chernyavskaya, Irina Davidov, Guchey Davydova, Margarita Dementyeva, Michael Domnitser, Raisa Dubrovskaya, Lev Dubrovskiy, Boris Elberg, Benyamin Epshteyn, Boris Fatkhiyev, Matvey Feldman, Alla Fiks, German Fishman, Yefim Fooks, Mariya Fortel, Fanni Galperina, Vladimir Gershengorin, Ella Gershengorina, Feyga Gersher, Leonid Gershfeld, Adam Gilman, Valentina Gilman, Ilya Gleyzer, Mikhail Glikman, Lidia Golokhovsky, Ada Gorbach, Valentina Gorelik, Naum Gorelik, Yelena Groysman, Basya Gurevich, Harry Hartman, Roza Josilevich, Adel Kagan, Alexander Kagan, Stella Kanevskaya, Liza Kaparovskaya, Samuil Kapelevich, Avva Karchevskaya, Zhanna Khaletskaya, Mikhail Khandros, Polina Kharaz, Yakov Khodorkovskiy, Zoya Kolker, Nikolay Koltonyuk, Tsilya Koltonyuk, Romen Kosterin, Roza Kotin, Etia Kouznetskaia, Polina Krasnikov, Berta Ksendzovskaya, Valentina Kukuliyev, Adela Kundin, Arkady Kupershtok, Oleg Lerner, Rima Lerner, Frida Lerner, Leonard Lev, Khanna Levitanus, Lora Libin, Arnold Lifshits, Grigory Marants, Inessa Marants, Nina Mayzel, Tamara Melnikova, Leyb Miller, Aleksandr Millerman, David Minkin, Moisey Modin, Danil Nakhshin,

Yefim Nebrat, Lazar Nekhanevich, Margarita Nerenburg, Valentina Nikchemny, Rada Ostrovskaya, Ella Pekar, Mikhail Pesin, Grigoriy Peskin, Yakov Polyakov, Sofiya Popelevskaya, Boris Porshnev, Lev Pozdner, Yevgeniya Pritsker, Zinoviy Pritsker, Yelizaveta Prokofyeva, Miron Rabinovich, Lidiya Rakhlina, Lioudmila Rapoport, Genriyeta Reytman, Kokhna Reznikova, Bela Roginkin, Yefim Roginkina, Lizaveta Ruvinova, Vladimir Ryaboy, Galina Rybalko, Lyudmila Sadovskaya, Abram Sapozhnikov, Franya Savinskaya, Vladimir Sekerko, Eugenia Selioutskaya, Rimma Shekhter, Yakov Shekhter, Lilya Shenkareva, Zoya Sherman, Boris Sheynerman, Yefrem Shifrin, Boris Shmidt, Valeriya Shmidt, Mikhail Shnayder, Leonid Shnaydman, Katia Shtivelband, Donata Sirota, Aleksandra Sklyarskaya, Joseph Slutsky, Roza Smushkevich, Inessa Sokolovskaia, Faina Sternberg, Ginda Tishenko, Ruzya Tochilovskaya, Hayrabet Tonakanian, Zinoviy Treyzon, Aleksandra Tulchinskaya,  Anatoly Vaisberg, Larisa Vaynshteyn, Inna Veyzer, Yeva Viktorova, Berta Voskoboynikova, Lyudmila Yavorskaya, Moisey Yefremov, Isaak Zak, and Margarita Zhislina.